FRANK A. GASTON, appellee, v. ROY L. FINCH, HAZEL M. FINCH and MARION COUNTY, defendants; ROY L. FINCH et ux., appellants.

No. 48796.

(Reported in 72 N.W.2d 507)

OCTOBER 18, 1955.

Bannister, Carpenter, Ahlers &' Cooney, of Des Moines, for appellants.

Miller & Sinnard and E. Raymond Mick, all of Knoxville, for appellee.

SMITH, J.—The case was tried as involving largely a question of fact and is so presented here by both parties. For that reason, doubtless, there is little citation of authorities. We perhaps could not do better than simply adopt the trial court's findings of fact which accurately and quite fully sum up the evidence. However, we shall proceed in our own way, referring to the findings as seems helpful.

The mortgage in suit was given by defendants June 30, 1952, to a bank in Knoxville, Iowa. It was originally for $4000 but had been reduced to $2000 by two $1000 payments dated respectively March 19 and September 8, 1953. It originally covered Lot 12 and other premises in Block 23, Original Plat of the town of Melcher, Marion County, Iowa.

Lot 11, originally covered, had been sold to plaintiff and one Ray Tickle and released from the mortgage. Plaintiff had thereafter sold Tickle his interest in it and had taken back a mortgage of $1000 on it.

Lot 12 was occupied by a small, vacant, one-story store building fronting south on the town square. Defendants resided in a home back of the store building.

Plaintiff, Frank A. Gaston (66) by his own description did carpenter and mason work "in fact, all kinds of work, digging ditches and so forth." He had been single "some thirty years."

Defendants are husband and wife. He was 67 years old, a mechanic and builder: "I build houses and buildings." The trial court found he had been a businessman and observed he originally "came to Melcher for the purpose of settling up and closing out a business there." Incidentally the mortgaged premises were a part of the property he so administered. We shall refer to Mr. Finch as defendant except when the plural is used.

Plaintiff admittedly obtained an assignment of the mortgage in suit here August 12, 1954, paying the bank $2011 therefor. Defendants contend that about or shortly before that date plaintiff bought Lot 12 of defendant under oral contract, agreeing to pay therefor the sum of $2238.13, by transferring the Tickle $1000 mortgage on Lot 11, giving back a $1000 mortgage on Lot 12, and paying $238.13 interest and taxes. They pray, by way of cross-petition, for specific performance of the alleged oral contract.

Defendant describes the opening of negotiations for the alleged oral contract of purchase as occurring Friday, June 25, 1954. He quotes plaintiff as saying "I would like to put in a good restaurant." After some further conversation he says he told plaintiff: "Now is your time. * * * I am anxious to dispose of that building. * * * You just pay what is against the property, the taxes, the interest, and the $2000 to the Iowa State Bank and you can have the building."

He says plaintiff then inquired: "Would you take Ray Tickle's note for $1000? * * * Then take a mortgage back on Lot 12 for $1000?" To which he says he replied "Yes", and that plaintiff responded: "Well, I will have to check up with my

bank." Of course there was no meeting of minds there and Gaston's alleged tentative counterproposal made no mention of paying any past due interest and taxes.

But Finch testifies that two days later plaintiff came over to defendants' back yard where defendants and Mrs. Finch's brother, Glenn Rhoades, were sitting and announced: "I am going to buy the building and put in a restaurant. This town is going to have the best restaurant it ever had." That, by defendant's reckoning, would be Sunday, June 27. Defendant further testifies plaintiff said: "There is one thing about it, the teenagers are not going to run that place. * * * I am going to carry a billyclub and if any of them come in, I am going to knock them in the head."

There is no other testimony of any oral proposition and acceptance and plaintiff expressly testifies "I never told Mr. Finch that I wanted to buy his building; I never told him that I would buy his building."

There is some slight corroborative testimony by Mrs. Finch and her brother, but it is neither strong nor very definite. And as the trial court points out "plaintiff is corroborated to some extent by some of his witnesses who worked with him making repairs to the building." Defendants claim the making of these repairs and also plaintiff's ordering the putting of water service into the building constituted a taking of possession by plaintiff under the alleged oral contract of purchase; also that plaintiff purchased certain materials and restaurant equipment. Plaintiff contends he was acting as defendant's agent in all these activities. On August 10, 1954, he filed a mechanic's lien for the labor of several workmen on the building.

Defendant for a short time had possession of plaintiff's $1000 Tickle mortgage and defendants claim that also was in partial performance of the alleged oral contract. He testifies he returned it to plaintiff under protest because plaintiff was threatening him with a knife. Plaintiff denies the knife episode and explains defendant's temporary possession was surreptitious and unauthorized. There is flat conflict of testimony at this point as indeed there is at most points.

On July 15, 1954, plaintiff gave defendant a check for $238.13. That is included in this suit and judgment therefor

demanded. Plaintiff claims it was a loan to defendant to be used in payment of taxes $188.13 and interest $50. Defendant admits it was paid him so he could pay those items but contends it was not a loan but in fact a down payment on the alleged oral contract. He claims he told plaintiff "You give me your check and the Tickle contract" (mortgage) "and I will go over and have Attorney Johnston, Jr., make up the contract * * *."

The parties agree in testifying plaintiff first wrote the check for *$250* but defendant rejected that larger amount and himself wrote one for $238.13, the exact amount necessary for the immediate purpose.

But this lone agreement in testimony is but an oasis in the Sahara of contradictions that envelop the episode and the entire case. Plaintiff testifies that after defendant wrote the check he (plaintiff) wrote the word "Loan" in the lower left-hand corner before signing and delivering it. Defendant, also under oath, denies that and says that after writing it he (defendant) added in the lower left-hand corner the words "Bldg. Purchase," before plaintiff signed it. We have the canceled check before us (Exhibit 4) but a photostat of it would probably throw little light helpful to this opinion. The word "Loan" is almost undecipherable, being merged with the abbreviation "Bldg." which is rather more legible. If plaintiff (as defendant implies) tried to superimpose the word "Loan" on the notation "Bldg. Purchase" he was quite unsuccessful in the attempt.

The trial court returned judgment in plaintiff's favor for $2238.13 with interest, awarded decree of foreclosure and denied defendants' prayer for specific performance. Defendants appealed on February 18. The record was settled April 27, 1955. In the meantime, on or about April 5, 1955, defendants filed "motion to set aside decree and for a new trial" on account of "newly discovered evidence" consisting of the proposed testimony of an expert as to whether the word "Loan" or the notation "Bldg. Purchase" on Exhibit 4 was written first.

The trial court denied the motion and defendants have appealed from that order and submit an additional record.

I. We have already commented on the absence of legal issues. The trial court held the defendants had the burden of

proving the oral contract alleged by them and upon their failure to carry that burden plaintiff would be entitled to judgment and decree of foreclosure.

Defendants do not question this proposition nor could it be successfully questioned. The pleading of the contract was in reality the tender of an affirmative defense and the *only* defense urged to plaintiff's pleaded cause of action. There was a practical confession and avoidance. The burden is on a defendant to prove any affirmative matters alleged as a defense. State v. Kroll, 244 Iowa 173, 180, 55 N.W.2d 251, citing 20 Am. Jur., Evidence, section 137, page 142. See also Clapp v. Cunningham, 50 Iowa 307; 31 C. J. S., Evidence, sections 107, 108.

II. We think the issue of fact must be resolved against defendants. According to defendant two propositions were discussed at the first (June 25) meeting. Plaintiff had agreed to neither. The alleged announcement by plaintiff, "I am going to buy the building", if established, would still give no clue as to which terms he was accepting. The two conversations would fall far short of proving a contract sufficient to justify denial of foreclosure or grant of specific performance.

Nor does the later ambiguous conduct of the parties, without resort to sharply contradictory testimony, support defendants' contention of part payment and taking possession by plaintiff under the alleged oral contract of sale. The significance of the conduct still depends on which party is to be believed.

In appraising the record on the respective veracity of witnesses we must lean somewhat on the judgment of the trial judge. His superior opportunity to observe and hear the witnesses entitles his decision to special consideration. While this is especially the rule in divorce and similar cases (Robbins v. Robbins, 234 Iowa 650, 652, 12 N.W.2d 564, and cases therein reviewed) it is also recognized to some extent in other equity appeals. Taggart v. Burgin, 185 Iowa 937, 171 N.W. 113. This does not mean however that we are to abdicate our function as triers de novo on appeal.

As bearing on the question of veracity there is the testimony of two witnesses impugning defendant's reputation for truth and veracity. Unpleasant as is the subject it must be con-

sidered here, where the conflicting testimony cannot be explained by a possibility of mutual mistake.

And it is important also to canvass the inherent probabilities of the situation. 30 C. J. S., Equity, section 479, page 875. The trial court here points out the improbability that a single man, sixty-six years old, who has all his life worked at the carpenter trade and sometimes at common manual labor, "would want to undertake the operation of a first-class restaurant or cafe"; and the reasonable probability on the other hand that defendant Roy Finch, a businessman with vacant premises on his hands, would desire to improve them and get them in better condition for sale. The observation is pertinent.

It is also improbable that defendant Roy Finch would allow the contract of sale to rest in parol from June 27 until July 10. He testifies that on the latter date plaintiff told him he (plaintiff) had to go to the hospital: "I said, 'We better get this thing fixed up before you go to the hospital.' * * * There was nothing else I could do, because he wouldn't stand for anybody fixing the papers in Melcher, because he didn't want them to know he was buying the building." That is the first testimony referring to having any papers drawn. And the idea that plaintiff was trying to keep secret a purchase of the building by himself and at the same time be taking such open and notorious possession of it seems unlikely.

In the matter of corroboration by the testimony of disinterested and unrelated witnesses plaintiff seems to qualify rather better than do defendants. They have Mr. Rhoades. He was present at the July 27 conversation and says he heard plaintiff talking about how he was going to "fix the restaurant and how he was going to have order and all." Rhoades heard nothing said about price, and his sister testifies: "Part of the time my brother was there; he didn't always stay right there, but he did hear some of the conversation." She herself expressed only an opinion (entirely different from her husband's testimony) on the subject of price and says "I can't say for sure what that agreement was."

The brother also testifies to some conversation in the car on the road to and from Des Moines on July 1, which tends to corroborate defendant's contention that plaintiff had gone along to purchase restaurant fixtures for himself.

On the other hand, an entirely disinterested witness, Mc-Kinney, who, under employment by plaintiff, worked in the building with plaintiff on July 6, testifies Roy Finch was there giving orders:

"I recall he said to paint over the front window so the people could not look in and lock the door so they couldn't come in to bother the workmen * * *. He told Frank Gaston to get some more men and hurry it along a little. Mr. Finch said to take the light meter out and move it on the outside." On cross-examination he testifies: "Q. Who hired you to scrape the paint off the ceiling of that building? A. Finch hired Gaston and me to go in there and work. Q. Did Finch ever tell you to go in there and work? A. He told Frank to get more help. When I overheard Finch tell Gaston to get more help I was already working there * * *. Gaston hired me to help him. Gaston told me to go up there and take the paint off the ceiling. I haven't been paid yet."

There is also the testimony of another disinterested witness, Carney Verwers, who runs the Sinclair station in Melcher. He says that the latter part of July or the first of August, 1954, he heard a "guy ask him (defendant) * * * what he was going to do with the building, and he said just as soon as he got it fixed up he was going to sell it. He said if he couldn't sell it, he was going to tear it down and make a sore eye for the town." Asked whether repairs had been placed on the building the witness replied: "Well, I don't know for sure. They had been working there, you know."

All these various considerations combine to persuade us defendants have not carried the burden of proving their defense by a preponderance of the evidence.

 III. Defendants complain of the trial court's refusal to grant a new trial on the ground of newly discovered evidence. There is some doubt as to whether the proposed new testimony was upon a question requiring or permitting expert opinion. Probably the condition of the check (Exhibit 4) was as apparent to the court as it would be to a handwriting expert.

However, we are content to rest our conclusion upon the ground chosen by the trial court. Exhibit 4 was produced by

plaintiff early in the trial when he was on the stand as the first witness. He was questioned on direct examination as to its execution and the relative priority of the notations on its lower left-hand corner. The conflict in the testimony of the principals was no surprise to defendants. Had they desired to seek for and offer expert testimony there was ample opportunity for them to have done so before the case was finally submitted and determined.

There was no abuse of discretion in denying the motion for new trial.

We have studied the record with care and are content with the decision of the trial court. It is accordingly affirmed.—Affirmed.

OLIVER, C. J., and BLISS, GARFIELD, WENNERSTRUM, HAYS, THOMPSON, and LARSON, JJ., concur.